UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

National Eastern Corp.,    :
    Plaintiff,    :
                 :    Case No. 3:04cv706 (JBA)
v.    :
                 :
Vegas Fastener MFG,    :
    Defendant.    :

### RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DOC. # 39]

Plaintiff National Eastern Corporation ("National Eastern") instituted this diversity action against defendant Vegas Fastener MFG ("Vegas Fastener") alleging breach of contract and bad faith for delivery of non-conforming nuts and bolts to plaintiff for use in a state bridge construction project, causing plaintiff financial damage for removal and replacement. See First Amended Complaint "FAC" [Doc. # 21]. Plaintiff's Motion for Summary Judgment [Doc. # 39] contends that there is no dispute that defendant provided plaintiff with non-conforming goods and thus breached the contract. The parties agree that Connecticut law is to be applied. For the reasons that follow, plaintiff's motion is granted in part and denied in part.

## I.   FACTUAL BACKGROUND

The undisputed facts show that plaintiff National Eastern was a subcontractor to Cianbro Corporation ("Cianbro") providing stainless steel products for Cianbro's construction of the Tomlinson Bridge, located in New Haven, Connecticut, for the

1

Connecticut Department of Transportation.  See Agreement
Plaintiff's Local Rule 56(a)(1) Stmt. [Doc. # 41] at ¶¶ 1-5.  In
September 2001, National Eastern entered into a contract with
Vegas Fastener for the purchase of various materials (including
nuts and bolts) of Type 316 steel.  Id. at ¶¶ 6 & Ex. 1(A)
(purchase order).  Vegas Fastener thereafter provided materials
to National Eastern with two Certificates of Compliance stating
that the materials met the specification for Type 316 steel,
along with test results.  Id. at ¶ 7 & Ex. 1(B).

In actuality, and unbeknownst to National Eastern when it
accepted the materials, most of the materials supplied by Vegas
Fastener were not of Type 316 steel, but of Type 304.  Id. at ¶¶
8, 12.[1]  After Cianbro used the materials in the bridge project,
it was discovered that the materials had corroded, and as a
result it was also discovered that they were non-conforming to
state specifications.  The Connecticut Department of
Transportation, as owner of the bridge project, demanded that the
nonconforming materials be removed and replaced with the
specified Type 316 steel products.[2]  Id. at ¶ 9.  Cianbro, as the

_____

[1]  After discovery and replacement of the nonconforming
materials, defendant informed plaintiff that "[t]he raw material
that we purchased for this order was 316 SS.  However, our vendor
supplied us with 304 SS and a 316 raw material certificate."  See
Pl's Local Rule 56(a)(1) Stmt. at Ex. 1(C).

[2]  Defendant concedes that most of the materials provided
were of Type 304, and not Type 316, steel, and that the
Connecticut Department of Transportation thus demanded that the

2

general contractor on the project, bore the costs of removal and
replacement and passed on the costs to plaintiff in the form of
back charges.  Id. at ¶ 10, 14-15. Plaintiff challenged the
amount of these back charges in an arbitration, which determined
that Cianbro was entitled to $98,146.00 in back charges.[3]  See
Arbitration Award [Doc. # 50] at 1.  Defendant does not dispute,
or offer any evidence to contest, that it received notice of
nonconformity within a reasonable time after plaintiff's
discovery, but only asserts that plaintiff's statement that
National Eastern and Cianbro contacted the defendant "almost
immediately" upon discovery of the nonconformity is an opinion,
not a statement of fact.  See Def's Local Rule 56(a)(2) Stmt. at
¶ 13.

---

materials be removed and replaced, but "denies that the materials
did not conform for the purpose for which they were used," see
Def. Local Rule 56(a)(2) Stmt. [Doc. # 45] at ¶ 9, arguing that
Types 304 and 316 steel are "substantially similar for their
intended use." See id. at 3, ¶ 1.

[3]  In the summary judgment briefing, prior to the issuance
of the arbitration award, the parties disputed the amount of
damages suffered by plaintiff as a result of defendant's breach
of the contract.  Plaintiff submitted materials purporting to
document damages in the amount of $95,487.94.  See Pl's Local
Rule 56(a)(1) Stmt. at Ex. 1(E) (letter to defendant providing
documentation of cost of removal and replacement); Ex. 2
(Muckenhirn Affidavit) at ¶¶ 16-17.  Defendant referred to a July
2003 letter from Cianbro to Vegas Fastener stating that the cost
of removal and replacement was estimated to be $73,720.00.  See
Def's Opposition Br. [Doc. # 44] at 12, Ex. 2.  In light of the
arbitration award, however, the amount of damages incurred by
plaintiff in the form of back charges from Cianbro appears now to
be established, as discussed below.

## II.   STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002) (internal quotation omitted).  "In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." Id. (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).

## III. DISCUSSION

## A.   Breach of Contract Claim (Count I)

Because the parties' contract was one for the sale of goods,

4

Article 2 of the Uniform Commercial Code ("UCC"), Conn. Gen.
Stat. § 42a-2-101 <u>et</u> <u>seq</u>., applies.  Plaintiff argues that
defendant is liable for plaintiff's damages caused by the
nonconformity of the materials tendered pursuant to UCC § 2-601,
which provides that if goods tendered "fail in any respect to
conform to the contract, the buyer may (a) reject the whole; or
(b) accept the whole; or (c) accept any commercial unit or units
and reject the rest," <u>see</u> Conn. Gen. Stat. § 42a-2-601, and UCC
§§ 2-607(3), 2-714, which provide that where a tender has been
accepted and the buyer has notified the seller within a
reasonable time after it discovered or should have discovered any
breach, the buyer "may recover as damages for any nonconformity
of tender the loss resulting in the ordinary course of events
from the seller's breach."  <u>See</u> Conn. Gen. Stat. §§ 42a-2-607(3),
42a-2-714(1).

Defendant believes that UCC § 2-608 applies, and argues that
plaintiff may only recover damages for a nonconformity that
substantially impaired the value of the goods to plaintiff.
Because defendant proffers an expert opinion regarding the
similarity of Types 304 and 316 steel, it contends that a genuine
issue of material fact exists as to whether the value of the
goods to plaintiff was substantially impaired because it can
prove that the Type 304 goods and Type 316 goods were
substantially similar for the purposes used.  <u>See</u> Def's

5

Opposition Br. at 5-7 & Ex. 1 (expert report of David. E. Hendrix, P.E.) (stating that for the intended purpose materials of Type 304 steel are substantially similar to materials of Type 316 steel, and materials of Type 316 steel would have corroded in the same manner as the Type 304 materials provided to plaintiff).

The UCC provides multiple remedies for buyers of nonconforming goods.  First, a buyer may reject a tender of goods at the outset if those goods "fail in any respect to conform to the contract."  See Conn. Gen. Stat. § 42a-2-601.  If the buyer has already accepted the goods, as here, the buyer may revoke his acceptance pursuant to UCC § 2-608 and recover the contract purchase price, or the buyer may elect to sue for damages resulting from the non-conformity pursuant to UCC § 2-607(3). See Conn. Gen. Stat. §§ 42a-2-607(3), 608; Comind, Companhia de Seguros v. Sikorsky Aircraft, 116 F.R.D. 397, 410-11 (D. Conn. 1987) (describing the various recovery options available to a buyer of nonconforming goods); Superior Wire & Paper Prods., Ltd. v. Talcott Tool & Machine, Inc., 184 Conn. 10, 13-14, 441 A.2d 43, 45 (Conn. 1981) ("If the buyer can demonstrate that he has been damaged by the nonconformity of the goods that he has accepted, he is entitled to recover such damages as he can prove. . . . Alternatively, if the buyer can demonstrate that the goods are substantially nonconforming, he is entitled, with some qualifications, to revoke his acceptance and recover the purchase

price.").  Whether a buyer who has accepted nonconforming goods chooses to revoke his acceptance or to sue for damages, that buyer is required to give notice to the seller "within a reasonable time after he discovers or should have discovered" the nonconformity.  <u>See</u>  Conn. Gen. Stat. §§ 42a-2-607(3), 608; <u>Superior Wire</u>, 184 Conn. at 12-16, 441 A.2d at 45-47.

If the buyer attempts to revoke its acceptance of the goods pursuant to UCC § 2-608, it must "show that their 'nonconformity substantially impairs [their] value to [it]' and that they were initially accepted because the buyer reasonably expected the seller to cure any defects or because the buyer could not immediately discover such defects."  <u>Superior Wire</u>, 184 Conn. at 16, 441 A.2d at 46 (citing Conn. Gen. Stat. § 2-608). Alternatively, a buyer who has accepted the goods may sue for damages under UCC §§ 2-607(3) and 2-714(1) for losses shown to result from "<u>any</u> nonconformity of tender."  Conn. Gen. Stat. § 2-714(1) (emphasis added).[4]

In this case, National Eastern could not return the goods upon discovery of nonconformity because they were already used in the bridge project, and does not seek to revoke its acceptance of

---

[4]  <u>See also</u> <u>Superior Wire</u>, 184 Conn. at 15, 441 A.2d at 46 (explaining that a buyer must prove "measurable damages," <u>i.e.</u>, "losses resulting in the ordinary course of events from the seller's breach," often "measured by the difference between the value of the goods accepted and the value they would have had if they had been as warranted," "augmented [where proven] by incidental or consequential damages").

the goods and recover the purchase price, effectively rescinding the contract, but rather seeks to recover consequential damages for the losses it incurred as a result of the nonconformity. Thus, this claim for damages for breach of contract is one pursuant to UCC §§ 2-607(3) and 2-714, and not UCC § 2-608.  <u>See</u> <u>Superior Wire</u> and <u>Comind</u>, <u>supra</u>.  Accordingly, the substantial impairment requirement of UCC § 2-608 is not applicable to plaintiff's claim.[5]  Because plaintiff's claim is one for damages, plaintiff may recover losses resulting from "any

---

[5]  The cases cited by defendant in its opposition are likewise distinguishable from this case because they involve claims for revocation of acceptance, where a plaintiff returned nonconforming goods and sought to recover the contract price, rather than claims for damages resulting from a nonconformity. <u>See</u> <u>D.P. Tech. Corp. v. Sherwood Tool, Inc.</u>, 751 F. Supp. 1038, 1041-42 (D. Conn. 1990) (concerning a buyer's attempted rejection of tender for untimely delivery, not a suit for damages for losses resulting from a nonconformity, noting that in the case of attempted rejection/rescission, "the perfect tender rule [in Connecticut] requires a substantial nonconformity to the contract before a buyer may rightfully reject the goods"); <u>Web Press Servs. Corp. v. New London Motors, Inc.</u>, 203 Conn. 342, 343-46, 525 A.2d 57, 59-60 (Conn. 1987) (concerning plaintiff's return of the nonconforming vehicle and attempt to revoke its acceptance and recover the purchase price pursuant to UCC § 2-608, Conn. Gen. Stat. § 42a-2-608); <u>Conte v. Dwan Lincoln-Mercury, Inc.</u>, 172 Conn. 112, 117-24, 374 A.2d 144, 147-49 (Conn. 1976) (discussing the substantial impairment requirement for revocation of acceptance of goods and recovery of purchase price pursuant to UCC § 2-608, Conn. Gen. Stat. § 42a-2-608, where plaintiff returned nonconforming vehicle to defendant 14 months after purchase); <u>Franklin Quilting Co. v. Orfaly</u>, 1 Conn. App. 249, 250-52, 470 A.2d 1228, 1229 (Conn. App. Ct. 1984) (discussing the substantial nonconformity "interpretation" of the perfect tender rule, in a case where plaintiff informed defendant that it no longer wanted defective machinery and, in face of defendant's silence, sold the machinery and sought to rescind the contract).

nonconformity," <u>see</u> Conn. Gen. Stat. § 42a-2-714(1), and is not required to meet "the higher standard of showing that the nonconformity of the goods 'substantially impairs their value to [it],' which is the statutory standard governing revocation of acceptance."[6]  <u>See</u> <u>Stelco Indus., Inc. v. Cohen</u>, 182 Conn. 561, 564, 438 A.2d 759, 761 (Conn. 1980) (citing Conn. Gen. Stat. § 42a-2-608).

UCC § 2-714, Conn. Gen. Stat. § 42a-2-714, provides:

Where the buyer has accepted goods and given notification as provided in subsection (3) of section 42a-2-607 he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

Conn. Gen. Stat. § 42a-2-714(1).[7]  The section further provides

---

[6]  Even if plaintiff were required to show that the nonconformity resulted in a substantial impairment of the value of the goods to plaintiff, plaintiff meets this higher standard. Defendant's arguments that the Type 304 and Type 316 steel are substantially similar for the purposes supplied, and that there is a genuine issue of material fact as to whether materials of Type 316 steel would also have corroded as did the Type 304 materials, are inapposite.  The value of the goods to plaintiff was substantially impaired not because the Type 304 materials corroded, but because the Type 304 materials were not the Type 316 materials specified by plaintiff in its contract with defendant and required by Cianbro and the Connecticut Department of Transportation for the bridge project, and thus the Connecticut Department of Transportation and Cianbro were entitled to charge plaintiff for the removal and replacement of the nonconforming materials.

[7] The Section states that the measure of damages is typically "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."

that "[i]n a proper case any incidental and consequential damages under [Section 2-715] may also be recovered." See Conn. Gen. Stat. § 42a-2-714(3).  Thus, pursuant to UCC §§ 2-607 and 2-714, in order to recover damages for the nonconformity of the goods supplied to plaintiff, plaintiff must prove: (1) that within a reasonable time after it discovered or should have discovered any breach it notified defendant of the breach, see Conn. Gen. Stat. § 42a-2-607(3); and (2) that plaintiff suffered losses in the ordinary course of events resulting from defendant's breach.  See Conn. Gen. Stat. § 42a-2-714(1).[8]

In this case, defendant has admitted that it provided non-conforming goods to the plaintiff under to their contract, in that it provided materials made of Type 304 steel, and not of Type 316 steel as specified.[9]  Moreover, as discussed above,

Conn. Gen. Stat. § 42a-2-714(2).

[8] Section 2-607(4) further provides that the burden is on the buyer to establish any breach with respect to the goods accepted, but the comment thereto notes that "this rule becomes one purely of procedure when the tender accepted was non-conforming and the buyer has given the seller notice of breach under subsection (3)."  Conn. Gen. Stat. § 42a-2-607, Cmt. 6.

[9] The parties' contract included an express warranty that Vegas Fastener would supply goods of Type 316 steel.  See Pl's Local Rule 56(a)(1) Stmt. at ¶ 6 & Ex. 1(A); Conn. Gen. Stat. § 42a-2-313 (express warranty created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" and by "[a]ny description of the goods which is made part of the basis of the bargain").  Vegas Fastener affirmed this warranty, and confirmed its compliance therewith, when it supplied plaintiff with certificates of compliance and test results stating that the

while defendant denies that plaintiff notified it "almost immediately," defendant does not rebut plaintiff's evidence of notification within a "reasonable time" after discovery by offering any evidence to contradict Mr. Muckenhirn's statement that defendant was notified of the nonconformity "immediately upon its discovery." <u>See</u> Pl's Local Rule 56(a)(1) Stmt. at Ex. 2, ¶ 15.  Thus, there is no disputed issue of material fact from which a jury could conclude that plaintiff is not entitled to damages flowing from defendant's tender of nonconforming goods.

As noted above, while the parties' briefing disputed the actual amount of damages, the arbitration commenced by National Eastern against Cianbro challenging the back charges amount has now concluded, entitling Cianbro to back charge plaintiff $98,146.00 for the nut and bolt removal and replacement.[10]  <u>See</u> Arbitration Award at 1.  Defendant is thus liable to plaintiff

---

materials provided were of Type 316 steel.  <u>See</u> <u>id</u>. at ¶ 7 & Ex. 1(B).

[10] While defendant argues that the costs of removal and replacement were not necessarily caused by the nonconformity – because a genuine issue of material fact exists as to whether materials of Type 316 steel would have similarly corroded – it is the fact of the nonconformity itself that caused plaintiff to suffer losses in the form of removal and replacement costs because as a result of the nonconformity, plaintiff had failed to comply with the specifications of its contract with Cianbro.  Had defendant supplied the specified materials of Type 316 steel and those materials also corroded, plaintiff would have complied with its contract with Cianbro and thus would not have incurred any loss because there would have been no basis for holding plaintiff liable.

for consequential damages incurred by plaintiff as a result of the nonconformity in the amount of $98,146.00.  Plaintiff is also awarded prejudgment interest at a rate of 10 percent,[11] from the time Cianbro deducted costs for removal/replacement from amounts otherwise due to plaintiff, see Muckenhirn Aff. ¶ 17, to the date of this ruling.[12]

## B.    Bad Faith Claim (Count II)

The Second Count in plaintiff's First Amended Complaint alleges that defendant breached its contract with plaintiff and did so in bad faith as follows: (1) defendant knew it was required to provide a certificate of compliance to plaintiff stating that the materials tendered conformed to those ordered, i.e., Type 316 steel; (2) defendant provided certificates of compliance attaching testing results from its wholly-owned

---

[11]  As the Second Circuit has acknowledged, whereas 28 U.S.C. § 1961 governs the award of postjudgment interest in federal cases, no federal statute controls the rate of prejudgment interest, see Jones v. UNUM Life Ins. Co. of America, 223 F.3d 130, 139 (2d Cir. 2000), and the Second Circuit "has not expressly endorsed a particular interest rate," Shorter v. Hartford Fin. Servs. Group, Inc., 03cv149 (WIG), 2005 WL 2234507, at *6 (D. Conn. May 31, 2005).  However, "when the court's jurisdiction is based upon diversity, an award of prejudgment interest is governed by state law."  See Charts v. Nationwide Mut. Ins. Co., 397 F. Supp. 2d 357, 385 (D. Conn. 2005).  The applicable Connecticut statute provides that "interest at the rate of ten percent a year, and no more, may be recovered . . . as damages for the detention of money after it becomes payable."  Conn. Gen. Stat. § 37-3a(a).

[12]  The Court is unable to determine from the documentation in the summary judgment record the actual date of Cianbro's backcharging.

laboratory certifying that the material "as tested, conforms to the specification requirements," <u>see</u> Pl's Local Rule 56(a)(1) Stmt. at Ex. 1(B), knowing that National Eastern would rely on the veracity of that information and would provide it to others involved in the project; and (3) once the materials failed, defendant acknowledged the failure, stating in a letter that its vendor had supplied it with "304SS [steel] and a 316SS raw material certificate."  FAC, Count II at ¶¶ 1-7.  Plaintiff argues that bad faith is established by the documents in that defendant supplied false Certificates of Compliance and testing results and thereafter acknowledged that it had in fact relied on the certificate of its vendor and admitted that it had supplied nonconforming goods.  Defendant contends that a genuine issue of material fact exists as to whether defendant shipped the Type 304 steel materials with an evil motive, as required for a claim of bad faith, or simply by mistake.[13]  Defendant also argues that summary judgment is not appropriate on claims involving a party's intent or state of mind.

Under Connecticut common law, every contract contains an implied covenant of good faith and fair dealing, the bad-faith

---

[13]   <u>See</u> <u>e.g.</u>, Def's Opposition Br. at 14 ("[Vegas Fastener] ordered Type 316 steel from its vendor, but the vendor supplied [Vegas Fastener] with Type 304 steel and a Type 316 raw materials certificate. . . .[Vegas Fastener's] mistake in reliance [sic] on its vendor does not constitute bad faith, but more likely mere negligence.").

violation of which is actionable in tort, see De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 849 A.2d 382, 387-88 (Conn. 2004), and the Court construes plaintiff's "bad faith" claim as brought under this tort theory, see Stetzer v. Dunkin' Donuts, Inc., 87 F. Supp. 2d 104, 114 (D. Conn. 2000).  Courts have defined bad faith as follows:

> Bad faith is the absence of good faith and generally implies "a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties. . . . [B]ad faith is not simply bad judgment or negligence, but rather implies the conscious doing of a wrong because of a dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.

See Stetzer, 87 F. Supp. 2d at 115 (citing Buckman v. People Express, Inc., 530 A.2d 596, 599-600 (Conn. 1987)).[14]  As defendant notes, "[s]ummary judgment is sparingly used where intent and state of mind are at issue."  See Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

While defendant appears to misapprehend plaintiff's claim for bad faith – specifically, defendant contests whether it supplied the Type 304 materials in bad faith, or merely by

------

[14] Accord De La Concha, 849 A.2d at 388 ("Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose.") (internal quotation and citation omitted).

mistake, whereas plaintiff contends that it was defendant's supplying of false compliance certificates and test results that constituted bad faith – defendant is correct that a genuine issue of material fact exists as to whether defendant acted in bad faith.  While the evidence provided by plaintiff – specifically the certificates of compliance with purported test results from defendant's wholly-owned subsidiary, coupled with the subsequent letter from defendant stating that defendant relied on its vendor's raw material certificate, see Pl's Local Rule 56(a)(1) Stmt. at Exs. 1(B), 1(C) – does provide a basis from which a reasonable fact finder could conclude that defendant acted in bad faith, such evidence does not establish that there is no genuine issue of material fact as to whether defendant was acting with a "dishonest purpose . . . a state of mind affirmatively operating with furtive design or ill will." Stetzer, 87 F. Supp. 2d at 115.  This is not a case in which plaintiff has offered evidence necessitating a conclusion that defendant's actions were motivated by a "true [dishonest] purpose." Cf. id. (denying defendant's motion summary judgment on plaintiff's bad faith claim where plaintiffs "offered evidence of a dishonest purpose that is more than mere conjecture or speculation" and defendant "failed to sustain its burden of showing the absence of a genuine issue of material fact," where plaintiffs submitted letters supporting an inference that defendant's "true purpose [in its

actions] was anti-competitive and prompted by a dishonest purpose rather than an honest mistake as to its rights or duties").[15] Accordingly, plaintiff's motion for summary judgment on its bad faith claim is denied.[16]

## IV. CONCLUSION

For the foregoing reasons, plaintiff's Motion for Summary Judgment [Doc. # 39] is GRANTED in part, as to the breach of contract claim (Count I), and plaintiff is awarded $98,146.00 in damages with interest at 10%, and DENIED in part, as to the bad faith claim (Count II).  The parties shall file their Joint Trial Memorandum within 30 days of the date of this ruling.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 24th day of March, 2006.**

---

[15]   Plaintiff's argument that provision of false test certificates is a criminal violation under Connecticut law, see Pl's Mem. of Law at 14 (citing Conn. Gen. Stat. § 53a-157b), is unpersuasive because it begs the question whether the intent requirement of the criminal statute was met where, as noted above, defendant's intent in supplying nonconforming goods remains in dispute.

[16] If plaintiff prevails on its claim of bad faith at trial, the proper measure of damages would be those suffered as a result of reliance on defendant's compliance certificates and test results, namely the removal and replacement costs of the nonconforming materials, which are duplicative of the damages to which plaintiff is entitled on its breach of contract claim. However, were plaintiff to prevail on its bad faith claim, upon showing entitlement to punitive damages, plaintiff could also recover attorneys fees and costs.

16